IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

MARGARITA VEJO,

               Plaintiff,

     vs.

PORTLAND PUBLIC SCHOOLS, a
public entity; ROBERTA COOPER,
individually and in her official capacity;
PETRA CALLIN, individually and in
her official capacity; LEWIS & CLARK
COLLEGE, an Oregon public benefit
corporation; and DOES 1 THROUGH 50,
inclusive,

               Defendants.

_____

No. 3:14-cv-01656-AA
OPINION AND ORDER

Herbert G. Grey
Attorney at Law
4800 SW Griffith Drive, Suite 320
Beaverton, OR 97005

Micah D. Fargey
Fargey Law PC
5 Centerpointe Drive, 4th Floor
Lake Oswego, OR 97035
        Attorneys for plaintiff

Michelle B. Smigel
Cody J. Elliott
Miller Nash Graham & Dunn LLP
111 SW Fifth Avenue, Suite 3400
Portland, OR 97204
     Attorneys for defendants Portland Public Schools, Roberta Cooper, and Petra Callin

Damien T. Munsinger
Paula A. Barran
Barran Liebman LLP
601 SW Second Avenue, Suite 2300
Portland, OR 97204
     Attorneys for defendant Lewis & Clark College

AIKEN, Judge:

Plaintiff Margarita Vejo was a master's degree student in defendant Lewis & Clark's Graduate School of Education and Counseling. As part of this program, she was placed in a counseling internship at Madison High School ("Madison"), which is part of defendant Portland Public Schools ("PPS"). Defendant Petra Callin ("Callin") is the principal at Madison and defendant Roberta Cooper ("Cooper") is a counselor at Madison who served as plaintiff's on-site internship mentor.[1] After about two months, Callin and Cooper terminated the internship. Lewis & Clark offered to let plaintiff continue in the program but imposed requirements before she would be placed in a new internship; those requirements would have delayed her graduation at least nine months. Plaintiff opted instead to transfer into a different Lewis & Clark program. She graduated on time but without a counseling degree.

Plaintiff then filed this action, asserting defendants violated her rights under the First and Fourteenth Amendments to the United States Constitution; various Oregon state antidiscrimination statutes; and Oregon contract law. After discovery, all defendants filed motions for summary

---

[1] This opinion refers to PPS, Callin, and Cooper collectively as "PPS defendants."

Page 2 - OPINION AND ORDER

judgment and motions to strike. For the reasons set forth below, the motions are granted in part.

## BACKGROUND

Plaintiff, a Russian-born orthodox Christian, immigrated to the United States as an adult. Vejo Decl. ¶ 3 Apr. 29, 2016; Vejo Dep. 129:7-14. For thirteen years, she worked as a social worker for the Immigrant and Refugee Community Organization ("IRCO"), assisting immigrant families in their transition to life in the United States. Vejo Decl. ¶¶ 4-6 Apr. 29, 2016. Her colleagues at IRCO describe her as a "tireless" advocate whose "quiet sensitivity, compassion and friendliness quickly put her clients at ease and engender[ed] trust." *See* Grey Decl. Ex. 28 at 3-13 Apr. 29, 2016.

In the fall of 2012, plaintiff enrolled in Lewis & Clark's Graduate School of Education and Counseling. Vejo Decl. ¶ 12 Apr. 29, 2016. Internships are a major component of the master's in counseling program at Lewis & Clark. Each student must complete three internships: two "micro" (100 hour) internships and one "macro" (full school-year) internship. PPS and Lewis & Clark have a contractual internship agreement facilitating the placement of Lewis & Clark counseling interns in PPS schools. The interns are not parties to the internship agreement, which gives PPS unilateral authority to terminate an internship whenever it deems removal in the school's best interest. Grey Decl. Ex. 13 at 2 Apr. 29, 2016.

The record contains mixed evidence regarding plaintiff's academic performance at Lewis & Clark. She earned very good grades in the majority of her courses. *See* Grey Decl. Ex. 38 Apr. 29, 2016. She also performed well in her initial "micro" internships; Heather Hadraba ("Hadraba"), the Director of the School Counseling Program, stated her only concern was plaintiff might have been "taking on a little bit too much" by clocking more than the required 100 hours. Hadraba Dep. 79:14-21. However, plaintiff received an incomplete in Ethical and Legal Issues after failing the final;

Page 3 - OPINION AND ORDER

withdrew from Social Justice and Diversity; and required substantial assistance with her writing assignments. Pederson Dep. 50:21-51:11, 127:10-12; Fletcher Dep. 42:6-14; Grey Decl. Ex. 24 at 2 Apr. 29, 2016.

Plaintiff also struggled with some of the subject matter in the courses. For example, Vicki McNamara ("McNamara"), who taught the Ethical and Legal Issues course in which plaintiff received an incomplete, stated "over the years that I've taught this class [plaintiff] stands out to me as the most uncomfortable [with discussions of adolescent sexuality.] I don't recall another student being that resistant and pushing back." McNamara Dep. 108:10-13. In an email written during plaintiff's first year in the program, McNamara documented concerns about plaintiff "seem[ing] out of touch and not understanding the culture in which she will work." Grey Decl. Ex. 19 at 2 Apr. 29, 2016. Earl Scott Fletcher ("Fletcher"), Dean of the Graduate School of Education and Counseling, recalled faculty members' concern that plaintiff had expressed "outrage" that a panel of lesbian, gay, bisexual, transgender, and queer professionals ("LGBTQ") had been part of the curriculum. Fletcher Dep. 42:24-43:5. Fletcher stated the faculty commented on plaintiff's "rigidity and . . . complete dismissal of the issues that were being raised. . . . They were concerned that [plaintiff] could make no space in her own understanding of the work to benefit from that experience[.]" Fletcher Dep. 43:8-14.

At the beginning of her second year at Lewis & Clark, plaintiff was accepted at Madison for her yearlong "macro" internship. Cooper selected plaintiff for the position based on her "strong background in working with refugees." Cooper Dep. 68:10-23. Cooper's initial impression of plaintiff's interactions with students was positive. Cooper Dep. 77:2-12. Hadraba, plaintiff's Lewis & Clark-based mentor, thought plaintiff was doing "good work" when she conducted an early site

Page 4 - OPINION AND ORDER

visit. Hadraba Dep. 146:6-147:23. In late September and early October, however, a series of interactions changed Cooper's evaluation of plaintiff's performance.

In mid- to late September, plaintiff had a conversation with Myriah Day ("Day"), a student support coordinator at Madison. Day was describing some of the student clubs at Madison, including the Black Student Union. Day Dep. 30:5-31:1. Plaintiff asked why Madison did not also have a White Student Union. Day Dep. 31:2-3. Day responded that "the White Student Union is everywhere, you know, everywhere we go in the world is the White Student Union because white is part of this culture that we live in." Day Dep. 31:2-10. The conversation then moved on to comparing the graduation rates at Madison to those at Lincoln High School ("Lincoln"), another PPS school. Madison and Lincoln are demographically different, a significantly larger percentage of Madison's students are low-income and/or of color. Day Dep. 32:17-23. Plaintiff expressed skepticism that demographics adequately explained the different graduation rates. Day Dep. 33:8-34:2. The conversation left Day concerned that plaintiff lacked cultural competency and a basic understanding of educational equity. Day Dep. 34:25-35:21. Because she was worried those deficiencies would negatively affect plaintiff's ability to counsel Madison students, Day shared the conversation and her thoughts about it with Cooper and Tammy O'Neill, Madison's assistant principal. Day Dep. 38:24-39:5. In a different conversation around the same time, plaintiff told Cooper students "either want to perform or they don't." Cooper Dep. 79:20-80:15. Like Day, Cooper worried plaintiff lacked the understanding of educational equity necessary to work with Madison students. Cooper Dep. 79:20-80:15.

Several weeks after these conversations with Day and Cooper, plaintiff and Erin Hale ("Hale"), a Madison counselor, counseled a student who was struggling to make social connections.

Page 5 - OPINION AND ORDER

Hale suggested referring the student to the Gay Straight Alliance ("GSA"). Hale Dep. 54:15-55:4, 55:23-56:8, 57:4-16. The student left, and plaintiff asked whether Hale planned to inform the parents about the referral because she assumed "that would be an appropriate first step before making a resource like [the GSA] available." Hale Dep. 58:14-20. Plaintiff shared with Hale she believed that homosexuality with "something that was created or a choice" and thus "could be changed." Hale Dep. 60:2-10. Hale believed allowing plaintiff to work with students who were "already fragile" could be "detrimental" if "her views were to come out." Hale Dep. 65:8-18. Hale feared plaintiff would be unable to direct students to the resources they needed. Hale Dep. 77:20-78:17.

The next day, Hale told Cooper about her conversation with plaintiff. Cooper Dep. 81:21-82:5. Cooper followed up with plaintiff, who substantially confirmed Hale's account of the conversation. Cooper Dep. at 84:2-7. Cooper then engaged plaintiff in a conversation about being "judgmental." Plaintiff recalled the conversation as follows:

Q.    Do you remember telling Roberta Cooper that in Russia you don't talk about homosexuality, or words to that effect?

A.    I remember I said that in Russian culture we don't talk personal stuff in the public, at work. And it doesn't matter if it's homosexual or heterosexual or whatever, we just don't talk about it. It's considered very impolite and rude and not appropriate.

Q.    And you remember telling Roberta Cooper that?

A.    Yes.

Q.    How did that come up?

A.    When I said that I am a Christian and I have Christian value, she immediately said, you judge people. And I say, no, I don't judge. And she said, you Russians judge people. I say, no, we don't judge. She said, your Russian government judge people.

Page 6 - OPINION AND ORDER

Vejo Dep. 78:8-25.

Cooper recalled the conversation somewhat differently:

Q.      [W]e started a conversation about being judgmental.

A.      Do you remember who started that conversation?

Q.      It was a part of the conversation. And so I asked her if she felt she was judgmental, and she said no. And then we continued along that same topic, and she told me at one point that gay people were diseased.

A.      Were those her words?

Q.      Yes.

A.      Okay.

Q.      And I said — I was shocked. And I said something to the effect of, do you not see that as a judgment? And she said, no, it's not a judgment, it's a scientific fact. And I said, what are you talking about? And she said, you can go on the website of the National Center for Disease Control and you can find that information, this isn't a judgment.

        And so for me I was trying to search in my mind, because part of the thing that I think we have to do as counselors is look at our own bias, and I was trying to find a way to help her see that there was a bias here, or at least in my opinion there was a bias.

        And so I said — we had also talked — the entire four weeks she brought up what happened in Russia a lot. And so I said, and what about — they had just made the announcement over the summer that Russia was — had made some announcement about gays not being able to participate in the Olympic Games. And I said, what about the Russians and their pronouncement that gays can't participate, don't you find that judgmental? And she said, it's not the Russians, that's the Russian government. And I said, okay, so don't you think that the Russian government is being judgmental? And she said, no, that she didn't.

Cooper Dep. 84:6-85:16.

        Plaintiff and Cooper agree that, during this conversation, plaintiff brought up rates of

sexually transmitted infections among gay and bisexual men. Plaintiff referred to a Centers for

Page 7 - OPINION AND ORDER

Disease Control website containing the information, telling Cooper, "once we educate students we're supposed to educate with all facts what we know" so that students understand "the available consequences" for their choices. Vejo Dep. 133:24-134:12, 135:5-13. Cooper understood plaintiff's statements to mean she believed gays were "diseased." Cooper Dep. 87:12-18.

When Hadraba next visited Madison, she and Cooper discussed plaintiff. Cooper relayed the conversation about LGBTQ students and sexually transmitted infection rates. Hadraba shared with Cooper that Lewis & Clark had concerns about plaintiff's "understanding of the support networks that are in place for LGBTQ youth." Hadraba Dep. 149:20-150:8. She also mentioned plaintiff's struggles with some of the social justice and educational equity concepts could be related to the fact she had not yet completed the Ethical and Legal Issues or Social Justice and Diversity courses. Hadraba Dep. 150:9-16.

Cooper spoke to Callin about plaintiff. Together, Cooper and Callin decided the internship should be terminated. At no time had they warned plaintiff termination was a possibility. Cooper sent Lewis & Clark a letter detailing the reasons for the termination:

> The first concern is her Cultural Competency. In the past week she has openly made statements to me and other staff which exhibit a color-blind prejudice that is potentially harmful in interacting with our students. School counselors need to possess a heightened sensitivity to the role color and poverty play in our student's lives to work with and advocate for them effectively. Margarita does not possess such skills.
>
> The second concern is her lack of Social Justice Competency. She has made statements to both Erin Hale and me referring to the LGBT population as diseased and a "wrong or bad" lifestyle. She has asked for clarification why we have a GSA at school and why we would refer students to such a group.
>
> I feel that for the above reasons we cannot allow Margarita to work with students unsupervised. Each counselor at our school has a caseload of 363 students so we do not have the time to supervise every interaction between a counseling intern

Page 8 - OPINION AND ORDER

and students. All 3 of our school counselors at Madison graduated from Lewis and Clark College from the School of Counseling Program and we expect that counseling interns have basic cultural and social justice competency. Since Margarita does not, we cannot continue to support her working with our students.

Grey Decl. Ex. 25. Although the letter was addressed to Lewis & Clark and not to plaintiff, Cooper offered to meet with plaintiff to discuss the termination decision. Hadraba told her such a meeting would be unnecessary. Cooper Dep. 103:9-17.

Lewis & Clark informed plaintiff about the termination of the internship. The faculty offered her two options. She could remain in the counseling program, subject to requirements that she complete the Social Justice and Diversity and Ethical and Legal Issues courses and complete ten hours of counseling before being placed in a new macro internship that following academic year. Grey Decl. Ex. 27 Apr. 29, 2016. That option would have extended her graduation date and required her to incur the cost of an additional year of school.[2] Alternatively, plaintiff could change the focus of her degree away from counseling and graduate in two years, as originally planned. Grey Decl. Ex. 31 Apr. 29, 2016. Plaintiff did not consider these options fair choices; instead, they "sound[ed] like disciplinary/punishment actions." Grey Decl. Ex. 32 Apr. 29, 2016. She elected the second option, changed her major, and graduated. Vejo Dep. 298:22-299:1.

---

[2] At oral argument, the parties disputed whether plaintiff would have had to incur any additional tuition costs; however, they agreed she would have been responsible for nine months of additional living expenses. There does not appear to be evidence in the record regarding living expenses for the relevant nine-month period during the 2014-15 school year, but it appears $20,000 is a rough estimate. Lewis & Clark's Graduate School of Education and Counseling website estimates room, board, transportation, and discretionary costs for this period for a nine-month period during the 2015-16 school year at $19,800, with an additional $1,900 for health insurance. https://graduate.lclark.edu/offices/admissions/paying_for_graduate_school/ (last visited Aug. 2, 2016).

Page 9 - OPINION AND ORDER

## STANDARDS

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine issue of material fact. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. Partnership*, 521 F.3d 1201, 1207 (9th Cir. 2008).

## DISCUSSION

### I.   *Defining the Summary Judgment Record*

Defendants have filed motions to strike various declarations and exhibits filed by plaintiff. Before turning to the motions for summary judgment, I must define the record by resolving those motions. All defendants move to strike the declarations of plaintiff's expert, Rodger Bufford, PhD., and PPS defendants move to strike a portion of plaintiff's declaration and an Exhibit 12 to the Grey Declaration, which is purportedly a copy of the American School Counselor Association ("ASCA") standards. Lewis & Clark makes its motion to strike by separate motion (doc. 65), while PPS defendants embed their motion to strike in their reply to their motion for summary judgment (doc. 66). For the reasons set forth below, the motions are granted in part and denied in part.

### A.   *Bufford Declaration*

An individual may testify as an expert only if he or she qualifies "as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Defendants challenge Bufford's

Page 10 - OPINION AND ORDER

qualifications, arguing he is not an expert on public school district evaluation of school counseling interns; the ASCA standards and whether Cooper was bound by them in her interactions with plaintiff; the Oregon Administrative rules on state counselor licensure; or discrimination and microaggressions. These arguments define expertise too narrowly and ignore the text and advisory committee notes to Rule 702, which "contemplate . . . a broad conception of expert qualifications." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994). Bufford has participated in accreditation procedures for graduate counseling programs with a special focus on disciplinary matters and determining whether students have met core competencies. He also works in a department at George Fox University that partners with a master's in counseling program similar to the one at Lewis & Clark. Bufford's qualifications, including his experience and publications, amply demonstrate he is qualified as an expert to opine on ethical matters related to the training and certification of school counselors.

Nonetheless, nearly all of Bufford's declarations must be stricken on other grounds. Bufford's primary conclusions — set out separately at the beginning of each declaration — are that defendants "exhibited invidious vias and discriminated against Vejo, contrary to ASCA ethical rules and [defendants' own] policies" and "interpreted and applied" the language of various documents in order to "cover up its own invidious bias and discrimination." Bufford Decl. at 4-5 Apr. 29, 2016 (doc. 57); Bufford Decl. at 4 May 2, 2016 (doc. 62). In addition, the final paragraphs of Bufford's first declaration document "clinically significant" evidence of "trauma" to plaintiff, specifically headaches, hypertension, anxiety, and disengagement. Bufford Decl. at 11 Apr. 29, 2016 (doc. 57).

These statements must be stricken for four reasons. First, an expert may not give any opinion related to intent, motive, or state of mind. *See Siring v. Or. State Bd. of Higher Educ. ex rel. Eastern*

Page 11 - OPINION AND ORDER

*Or. Univ.*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013) ("The jury is sufficiently capable of drawing its own inferences regarding intent, motive, or state of mind from the evidence, and permitting expert testimony on this subject would be merely substituting the expert's judgment for the jury's and would not be helpful to the jury.") Accordingly, any statements about defendants' intent (being biased or taking steps to cover up bias) must be stricken. Second, an expert may not give an opinion on an ultimate legal conclusion. *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004). This means any statement that defendants discriminated against plaintiff on account of her religion, race, or national origin are improper. Third, contract interpretation is a question of law, and thus inappropriate subject matter for expert opinion. *McHugh v. United Serv. Auto. Ass'n*, 164 F.3d 451, 454 (9th Cir. 1999). Thus, any opinion about the correct interpretation of ambiguous contractual language is inadmissible. Finally, Bufford may not give any diagnosis or hypothesis regarding plaintiff's reaction to purported microaggressions, as he has never examined her.

Bufford's declarations are admissible only on the limited question whether the actions taken and processes followed by defendants conflict with ASCA and other ethical standards and/or with defendants' own policies. The jury must be left to draw its own conclusion regarding whether any inconsistencies give rise to an inference of impermissible discrimination. Plaintiff's citation to *Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012), does not alter this analysis. In *Ward*, the plaintiff's expert, a former chair of the American Mental Health Counselors Association's ethics committee, opined that the plaintiff's request to refer a homosexual client to another counselor rather than counsel that client was compliant with the ethics code. *Id.* at 736. That sort of narrow opinion about the applicability of ethical rules is precisely the type of statement that remains admissible under this

Page 12 - OPINION AND ORDER

Opinion.

## B. *Plaintiff's Declaration*

PPS defendants move to strike the final three paragraphs of plaintiff's second declaration and an accompanying set of exhibits. The material at issue relates to a school district intern inviting plaintiff to participate in a panel discussion about effective engagement with youth from diverse communities. PPS defendants move to strike this material on relevancy grounds.[3] Plaintiff responds that the invitation to serve on this panel shows she does have cultural competency skills and goes to whether the stated reasons for terminating her internship were pretextual. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. This evidence meets the broad test for relevancy. The motion to strike is denied as to plaintiff's declaration.

## C. *Copy of ASCA Standards*

Finally, PPS defendants move to strike a document purporting to show the ASCA standards governing counselors' relationship with their clients. PPS defendants move to strike due to lack of authentication. Plaintiff concedes the document has not been adequately authenticated. Authentication is mandatory. *See* Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent *must* produce evidence sufficient to support a finding that the item is what the proponent claims it is." (emphasis added)). The content of

---

[3] PPS defendants also challenge plaintiff's failure to provide this information earlier in the discovery process. In light of the fact that the invitation to speak on the panel did not occur until January 2016, I am satisfied by plaintiff's explanation that she disclosed it as soon as she knew the information was relevant and responsive to discovery requests. *See* Fed. R. Civ. P. 26(e)(1)(A).

professional standards might be an appropriate subject for judicial notice if, for example, they were readily accessible on the organization's public website. *See* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.") But here, a review of the public ASCA website reveals differences between Exhibit 12 to the Grey Declaration and the publicly available standards. The Court thus cannot ascertain whether Exhibit 12 is an accurate historical version of the standards, and must grant the motion to strike the exhibit.

II.     *Motion for Summary Judgment*

With the record so defined, I turn to defendants' motions for summary judgment. I first address PPS defendants' broadly applicable arguments regarding the section 1983 claims against PPS and against Cooper and Callin in their official capacities. I then address plaintiff's other claims in the following order: First Amendment claims; federal equal protection and analogous state-law discrimination claims; due process claims; and contract claims.

A.     *Federal Claims Against PPS and Official-Capacity Claims Against Cooper/Callin*

A public employee's unconstitutional discretionary actions generally do not accrue to the employer. *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992). Municipal liability under section 1983 attaches only when "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). The same standard applies to official-capacity suits against government employees, because official-capacity suits are just a different way of pleading an action against the entity. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985).

Page 14 - OPINION AND ORDER

Whether an official has final policymaking authority is controlled by state law. *Gillette*, 979 F.2d at 1346. Oregon law vests final policymaking authority with the School Board. Or. Rev. Stat. § 332.107. The Portland Public School Board, in turn, has delegated "executive, supervisory, and institutional functions to the Superintendent." Portland Public School Board Policy 1.10.010-P.[4] The authority to hire and fire is insufficient to show policymaking authority; the plaintiff must show the decision was made by a person with the power to establish policy for the entire entity. *Pembaur*, 475 U.S. at 482-83 & n12. Alternatively, the plaintiff may show a final policymaker ratified both the decision and the basis for it. *Gillette*, 979 F.2d at 1348.

Plaintiff has not met this standard here. There is no evidence Callin or Cooper had authority to establish policy for the entire school district. That they made the decision to terminate plaintiff's internship does not create a viable municipal liability claim, because there is no evidence a final decisionmaker (*i.e.* the School Board or the Superintendent) even knew about the decision, much less ratified it and the reasons behind it. PPS defendants are entitled to summary judgment on all federal constitutional claims against PPS and on all official-capacity claims against Cooper and Callin.

## B. *First Amendment Claims Against Callin and Cooper*

Plaintiff alleges PPS defendants retaliated against her for expressing certain views, in violation of the First Amendment.[5] In order to analyze her free expression claim, it first is necessary

4

http://www.pps.net/cms/lib8/OR01913224/Centricity/domain/219/policies/1/1_10_010_P.pdf.

[5] Plaintiff also asserts a compelled speech claim. However, plaintiff argues she was retaliated against for making statements about her beliefs that the government found repugnant, not that she was compelled to make statements she did not want to make. Because she has failed to allege compelled speech, PPS defendants are entitled to summary judgment on plaintiff's

Page 15 - OPINION AND ORDER

to determine the appropriate legal framework when an unpaid intern asserts a First Amendment retaliation claim. Once the appropriate framework has been identified, I must address whether Callin and Cooper are entitled to qualified immunity.

### 1.  *Applicable Legal Framework*

There are three frameworks that could apply to plaintiff's First Amendment claim. The first possibility, established in *Pickering v. Board of Education of Township High School District 205, Will County, Illinois*, 391 U.S. 563 (1968), would treat plaintiff as a public employee. *Pickering* requires balancing the employee's free expression rights against the state's interest as an employer.[6] *See Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 961 (9th Cir. 2011). The second option, established in *Oyama v. Univ. of Haw.*, 813 F.3d 850 (9th Cir. 2015), would treat plaintiff as a graduate student seeking professional certification. *Oyama* requires assessing whether a decision to deny certification to a student due to the content of the student's speech was "based on defined professional standards, [rather than] on officials' personal disagreement with students' views." *Id.*

_____

compelled speech claim. *See C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 189 (3d Cir. 2005) ("[A] violation of the First Amendment right against compelled speech occurs only in the context of actual compulsion.")

[6] PPS defendants contend unpaid interns have *no* First Amendment rights in the context of their internship, arguing it makes little sense to give unpaid interns the same free expression rights as permanent, paid employees with state-law property rights in their jobs. This argument conflates due process and free speech principles and turns *Pickering* on its head. *Pickering* holds that when the government acts as employer, it has *more* power than usual to limit speech because "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." 391 U.S. at 568. Put differently, public employees' free speech rights are *more limited* than the free speech rights of the general public. PPS defendants cite no case to support their assertion that an unpaid intern in a public school forfeits her First Amendment rights.

at 868. Third, it is possible the generally applicable forum-based framework for free expression claims applies. *See, e.g., Preminger v. Principi*, 422 F.3d 815, 823 (9th Cir. 2005) (explaining test for content-based restrictions in a nonpublic forum).

The last alternative is the easiest to reject. The tests articulated in *Pickering* and *Oyama* acknowledge that the government has a heightened interest in regulating the speech of certain individuals based on the special relationships of employer-employee and certifying entity-student. The facts in this case may not perfectly fit under the *Pickering* or *Oyama* umbrellas, but there are clear parallels between the governmental interests at issue in those cases and the interests of PPS defendants here. PPS defendants' interests here include running the public schools in an orderly fashion, using school resources efficiently, keeping students safe, and protecting themselves from liability. It is clear this is a case where the government's interest in plaintiff's speech is qualitatively different than in "pure" free expression cases. The typical forum-based framework does not apply.

Next, it is necessary to determine whether plaintiff was more like a public employee or more like a student seeking certification in the context of her PPS internship.[7] In First Amendment cases, the Ninth Circuit applies a functional approach to determining whether an individual spoke on a matter of public concern. *Weeks v. Bayer*, 246 F.3d 1231, 1234 (9th Cir. 2001). This same

_____

[7] Neither the Ninth Circuit nor this court has decided whether an unpaid intern or volunteer is a public employee for the purposes of the First Amendment. There is disagreement among the federal courts on this question. *Compare Beaton v. City of Allen Park*, 2015 WL 3604951, *8 n.1 (E.D. Mich. Jun. 8, 2015) (questioning whether an "unpaid volunteer serving on a single City advisory board" was a public employee for First Amendment purposes) *with Anderson v. McCotter*, 100 F.3d 723, 725 (10th Cir. 1996) (stating in dicta that *Pickering* governs volunteer's First Amendment claim whether or not she had full public employee status); *see also Mathews v. City of South Bend*, 2013 WL 2149482, *6-7 (N.D. Ind. May 16, 2013) (assuming without deciding that an unpaid volunteer had employee status and applying *Pickering*).

Page 17 - OPINION AND ORDER

pragmatism guides the analysis of whether an individual speaks as a public employee or a private citizen. *Dahlia v. Rodriguez*, 735 F.3d 1060, 1069 (9th Cir. 2013). Applying a similar, pragmatic approach here, I conclude plaintiff's role at PPS was more analogous to public employee than to graduate student seeking certification. Plaintiff was not at PPS to take courses; she was at PPS to work directly with students. Although there was a significant learning component to her job, it is PPS policy to have counseling interns work with students unsupervised. This renders PPS's interest in limiting counseling intern speech most similar to its interest in limiting the speech of paid employees. Accordingly, *Pickering* supplies the correct framework for analyzing plaintiff's claims.

## 2. *Qualified Immunity*

"An official sued under [section] 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). In order to deny qualified immunity to an official, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 741.

Cooper and Callin are protected by qualified immunity because it is not obvious that defendants' alleged actions violated plaintiff's First Amendment rights under *Pickering*.[8] The Ninth

---

[8] As the foregoing analysis in Section II.B.1 demonstrates, there is plainly room for debate on the correct First Amendment standard to apply. Nonetheless, Cooper and Callin would not be entitled to qualified immunity if plaintiff could show their actions violated her First Amendment rights under every conceivably-applicable First Amendment framework. *See Hope*

Page 18 - OPINION AND ORDER

Circuit has established "a sequential five-step inquiry" to determine whether an employer's restriction on an employee's free expression violates the First Amendment. *Johnson*, 658 F.3d at 961. The court must determine

(1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Id.* (citing *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009)).

The law is not clearly established regarding whether statements like plaintiff's are on matters of public concern. "Speech involves a matter of public concern when it can fairly be considered to relate to any matter of political, social, or other concern to the community." *Eng*, 552 F.3d at 1070 (citations and quotation marks omitted). By contrast, employee speech generally is not protected under *Pickering* when it deals with "individual personnel disputes and grievances and . . . would be of no relevance to the public's evaluation of the performance of governmental agencies." *Id.* (citations and quotation marks omitted). Speech may be on a matter of public concern when it addresses "the preferable manner of operating the school system," which "clearly concerns an issue of general public interest." *Pickering*, 391 U.S. at 571. However, whether a public employee's speech is on a matter of public concern depends on "the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 148 (1983). "The employee's motivation and the chosen audience are among the many factors to be considered in light

---

*v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates clearly established law even in novel factual circumstances," so long as the government had "fair warning that its alleged [action] was unconstitutional.")

of the public's interest in the subject matter of the speech." *Johnson v. Multnomah Cnty.*, 48 F.3d 420, 425 (9th Cir. 1995).

It is possible to view plaintiff's statements as addressing policy choices regarding how to counsel students. Plaintiff (1) stated she thought parents should be informed before a student is referred to the gay-straight alliance; (2) suggested teaching sexual education taking into account multiple religious perspectives; and (3) referred to information about rates of sexually transmitted infection in different population groups. These statements arguably express opinions on the wisdom of Madison High's counseling policy and approach to LGBTQ students, topics most people would consider "relevan[t] to the public's evaluation of the performance" of the school. *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983).

It is equally possible, however, to interpret plaintiff's statements as those of a counseling intern working through cognitive dissonance over the differences between her experiences and beliefs and the policies in place at Madison. Indeed, this is precisely the interpretation plaintiff's counsel urged at oral argument. Plaintiff's counsel stated that plaintiff's questions involved no "judgment calls" but rather were good-faith inquiries to a mentor. There is no clearly established law holding those sorts of questions are statements on a matter of public concern within the meaning of *Pickering*. Cooper and Callin are entitled to qualified immunity on plaintiff's First Amendment claims.

## C.   *Equal Protection and State-Law Discrimination Claims*

### 1.   *State-Law Claims Against Lewis & Clark*

Plaintiff advances three bases for its state-law discrimination claims against Lewis & Clark. First, plaintiff asserts claims under Or. Rev. Stat. § 345.240, which addresses discrimination in

Page 20 - OPINION AND ORDER

"career schools." Second, plaintiff contends Lewis & Clark is bound by Or. Rev. Stat. § 659A.403, which prohibits discrimination on the basis of race, religion, or national origin in "places of public accommodation" as defined in Or. Rev. Stat. § 659A.400(1). Third, plaintiff seeks to hold Lewis & Clark liable for aiding and abetting PPS defendants' discrimination, in violation of Or. Rev. Stat. § 659A.403. The first and second theories fail as a matter of law, while the third cannot survive summary judgment due to lack of evidence.

### i.    *Career School*

Oregon law provides that a "career school" may not "discriminate in giving instruction to any person otherwise qualified." Or. Rev. Stat. § 345.240(1). A "career school" is any "private proprietary professional, technical, home study, correspondence, business or other school instruction, organization or person that offers any instruction or training for the purpose or purported purpose of instructing, training or preparing persons for any profession." Or. Rev. Stat. § 345.010(3). The statute expressly provides that the provisions governing career schools do not apply, "except as provided in [Or. Rev. Stat. §] 345.017, to schools approved by the Higher Education Coordinating Commission [("HECC")] to confer or offer to confer academic degrees under [Or. Rev. Stat. §] 348.606." Or. Rev. Stat. § 345.015(10). Lewis & Clark falls within this carve-out because it is approved by HECC to confer academic degrees.[9] Nor does section 345.017 bring Lewis & Clark back into the definition of "career school." That section explains the licensing requirements for any

---

[9] *See* www.oregon.gov/HigherEd/Pages/campuslinks.aspx (listing Lewis & Clark as a "private . . . institution . . . authorized by the HECC Office of Private Postsecondary Education, Office of Degree Authorization"). The Court *sua sponte* takes judicial notice of this listing on Oregon's official state website because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2), (c)(1).

HECC-approved degree-conferring schools that continue to offer a course or program that does not lead to an academic degree. Or. Rev. Stat. § 345.017. It is undisputed that plaintiff was in an academic degree program at Lewis & Clark. Lewis & Clark is entitled to summary judgment on the discrimination claims brought under Or. Rev. Stat. § 345.240.

## ii. *Place of Public Accommodation: Lewis & Clark*

The next question is whether Lewis & Clark is a "place of public accommodation." Oregon law provides:

> [A]ll persons within the jurisdiction of this state are entitled to the full and equal accommodations, advantages, facilities and privileges of any place of public accommodation, without any distinction, discrimination or restriction on account of race, color, religion, sex, sexual orientation, national origin, marital statue or age if the individual is of age . . . or older.

Or. Rev. Stat. § 659A.403(1). With respect to places owned by non-public entities, a "place of public accommodation" is "[a]ny place or service offering to the public accommodations, advantages, facilities or privileges whether in the nature of goods, services, lodgings, amusements, transportation or otherwise." Or. Rev. Stat. § 659A.400(1)(a). As relevant here, the question is whether Lewis & Clark meets this definition without falling into the exception set forth in Or. Rev. Stat. § 659A.400(2)(e), which excludes "[a]ny institution, bona fide club or place of accommodation that is in its nature distinctly private."

Oregon courts apply a two-step inquiry to determine whether a private entity is a place of public accommodation under the statute. First, the court must ask whether the entity is a "business or commercial enterprise." *Lahmann v. Grand Aerie of Fraternal Order of Eagles*, 121 P.3d 671, 674 (Or. Ct. App. 2005). If so, the court must determine whether the entity's "membership policies are so unselective that the organization can fairly be said to offer its services to the public." *Id.* A

Page 22 - OPINION AND ORDER

series of cases have mapped the contours of this provision. *See, e.g.*, *Roberts v. Legacy Meridian Park Hosp., Inc.*, 2014 WL 294549, \*7 (D. Or. Jan. 24, 2014) (hospital was public accommodation and was bound by nondiscrimination requirements of state law with respect to granting clinical privileges to licensed neurosurgeons); *Schwenk v. Boy Scouts of America*, 551 P.2d 465, 469 (Or. 1976) (Boy Scouts are not a place of public accommodation because they do not offer goods or services to the public within the meaning of the Act, *i.e.*, some sort of business or commercial enterprise offering the goods or services); *Lahmann*, 121 P.3d at 676 (Or. Ct. App. 2005) (private fraternal organization was a place of public accommodation due to its very loose membership requirements, which rendered it *de facto* open to the public).

Most instructive here is *Abukhalaf v. Morrison Child & Family Servs.*, 2009 WL 4067274 (D. Or. Nov. 20, 2009). In *Abukhalaf*, this Court had to determine whether the defendant organization, a recruiter of foster parents for the state, was a public accommodation. *Id.* at \*7. The Court cited *Graham v. Kold Kist Beverage Ice, Inc.*, 607 P.2d 759, 762 (Or. Ct. App. 1979), in which the Oregon Court of Appeals held a "corporation engaged in the business of selling commercial equipment at wholesale for use in retail stores, was not engaged in the sale of goods 'to the public' within the intended meaning of the public accommodation act." The Court then analogized the foster-parent recruiter to the wholesaler in *Graham*:

> Similarly, like the wholesaler who advertises its wares to retailers, but retains discretion as to which retailers it sells to, defendant advertises the opportunity to become a foster parent to the public, but then ultimately retains discretion as to which applicants are chosen. Both are selective, rather than nonselective, processes. Both involve discretion, and indeed the selection of a foster parent candidate seems at least as selective as the selection of retailers, if not more so.

*Abukhalaf*, 2009 WL 4067274 at \*7. Public accommodations laws did not apply because "the

Page 23 - OPINION AND ORDER

evidence in this record demonstrates that foster parenting through defendant is not a *de facto* public opportunity. It is a highly selective process." *Id.*

I find the analysis in *Abukhalaf* persuasive and apply it here. Lewis & Clark meets the first part of the public accommodation test because it is a commercial or business entity. However, its membership processes are not so unselective that it is *de facto* open to the public. Plaintiff challenges Lewis & Clark's claim of selectivity, asserting that two-thirds of applicants to its counseling program are accepted. Even assuming that is the case,[10] a program that rejects one-third of its applicants is not *de facto* open to the public. Lewis & Clark is entitled to summary judgment on plaintiff's claims under Or. Rev. Stat. § 659A.403.

### iii.   *Aiding and Abetting PPS's discrimination*

PPS retained unilateral authority to terminate plaintiff's internship. No evidence in the record suggests that Lewis & Clark was aware PPS was contemplating terminating plaintiff's internship or played a significant role in the termination. The letter to Lewis & Clark explains PPS's decision, but it is not phrased as a request. Lewis & Clark is entitled to summary judgment on plaintiff's aiding and abetting claim.

### 2.   *State-Law Claims Against PPS Defendants*

Plaintiff's asserts two types of state-law discrimination claims against PPS defendants. First, plaintiff contends she is protected from discrimination under Or. Rev. Stat. § 659A.350(3)(b), which

---

[10] Plaintiff purports to support this assertion with a citation to the record. Pl.'s Opp. L&C Mot. Summ. J. at 22 (doc. 54). Although the cited exhibit contains information about the number of students admitted to the counseling program each year (thirty-two), it does not appear to state what percentage of applicants are admitted or how many applications the school typically receives. Fargey Decl. Ex. L 44:3-8 (doc. 55-1 at 79).

gives individuals who meet the statutory definition of "intern" the employment protections set forth in Or. Rev. Stat. § 659A.030. Second, she argues Madison is a place of public accommodation pursuant to Or. Rev. Stat. § 659A.400(1), and that she is therefore protected from discrimination during her time at Madison pursuant to Or. Rev. Stat. § 659A.403(1). I conclude plaintiff does not meet the statutory definition of intern, but that her state-law discrimination claims against PPS defendants may proceed because Madison is open to the public within the meaning of the statute.

i.    *Discrimination Protection for Interns*

Oregon law extends the anti-discrimination protections in section 659A.030 to interns only if "the employer and the person performing the work agree in writing that the person performing the work is not entitled to wages for the work performed." Or. Rev. Stat. § 659A.350(3)(b). It is undisputed that there was never a written agreement between plaintiff and PPS. Instead, the written agreement governing plaintiff's internship was between PPS and Lewis & Clark.

Plaintiff urges the Court to override the absence of a written agreement between her and PPS as a technicality, arguing she was a clear third-party beneficiary of the PPS-Lewis & Clark intern agreement. She also points to the broad legislative declaration that the purpose of Oregon's unemployment protections

is to encourage the fullest utilization of the workforce by removing arbitrary standards of race, color, religion, sex, sexual orientation, national origin, marital status, age or disability as a barrier to employment of the inhabitants of this state, and to ensure the human dignity of all people within this state and protect their health, safety and morals from the consequences of intergroup hostility, tensions and practices of unlawful discrimination of any kind based on race, color, religion, sex, sexual orientation, national origin, martial status, age, disability, or family status.

Or. Rev. Stat. § 659A.003.

Neither argument permits this Court to ignore the plain text of the statute. In Oregon, "the

Page 25 - OPINION AND ORDER

cardinal rule of statutory construction is that a court shall pursue the intent of the legislature if possible." *State v. Gaines*, 206 P.3d 1042, 1047 (Or. 2009). The first step in this process is "an examination of text and context." *Id.* at 1050. The text of section 659A.350(3)(b) brings interns under the protections of section 659A's employment laws only if there is a written agreement between the intern and the employer. Because no such agreement existed here, plaintiff was not an "intern" within the meaning of the statute. PPS defendants are entitled summary judgment on plaintiff's section 659A.030 claims.

ii.     *Place of Public Accommodation: Madison*

Plaintiff also contends Madison, a public high school, is a place of public accommodation pursuant to § 659A.400(1). After carefully reviewing the 2013 amendments to the statutory definition of "place of public accommodation," I agree.

As explained above, the longstanding definition of "place of public accommodation" is "[a]ny place or service offering to the public accommodations, advantages, facilities or privileges whether in the nature of goods, services, lodgings, amusements, transportation or otherwise." Or. Rev. Stat. § 659A.400(1)(a). In *C.O. v. Portland Pub. Schs.*, 406 F. Supp. 2d 1157, 1172 (D. Or. 2005), this Court held public schools were not places of public accommodation within the meaning of that provision. However, *C.O.* does not decide the question presented here, because the statute has been amended since *C.O.* was decided.

In 2013, the Oregon Legislature added two new provisions to the statutory definition. *See* 2013 Oregon Laws Ch. 429 (H.B. 2668). The law now provides a place of public accommodation is also "[a]ny place that is open to the public and owned or maintained by a public body . . . regardless of whether the place is commercial" and "[a]ny service to the public that is provided by

Page 26 - OPINION AND ORDER

a public body . . . regardless of whether the place is commercial in nature." *Id.* § 659A.400(1)(b) & (c). These definitions remain subject to certain exclusions, including the provision stating that a place of public accommodation does not include "[a]n institution, bona fide club or place of accommodation that is in its nature distinctly private." *Id.* § 659A.400(2)(e).

The public schools are indisputably owned and maintained by a public body. They are places and they also provide services. Finally, there is no question that a public school is not "in its nature distinctly private." *Id.* § 659A.400(2)(e). The question, then, is whether they are open to the public. There are good arguments on both sides. In one sense, schools heavily restrict who can access their campuses: only students of a certain age may enroll, and only staff, students, and authorized visitors are permitted free movement on school grounds. On the other hand, enrollment is open to all children in the state seeking to attend public school.

Whether public schools are places of public accommodation under Oregon law as amended in 2013 is a question of first impression. Because the text of the law is ambiguous, it is particularly appropriate to consider legislative history. *See Gaines*, 206 P.3d at 1051 (Or. 2009) (ambiguity is not required before a court considers legislative history in interpreting an Oregon statute, but such history is generally most helpful in cases where the text is ambiguous). Here, however, the legislative history is also ambiguous. The bill containing the 2013 amendments was introduced at the request of the Oregon Bureau of Labor and Industry ("BOLI"). Hearing on H.B. 2668 Before the H. Comm. on Judiciary, 2013 Leg., 77th Sess. (Or. 2013) (statement of Brad Avakian, Commissioner of BOLI).[11] In testimony before the Senate Committee on the Judiciary, Elizabeth

---

[11] Audio recording at 6:40, http://oregon.granicus.com/MediaPlayer.php?clip_id=1815 (last accessed Aug. 4, 2016).

Cushwa, a BOLI representative, used the example of a church renting a gym from a public school to illustrate the reach of the law. Hearing on H.B. 2668 Before the S. Comm. on Judiciary, 2013 Leg., 77th Sess. (Or. 2013) (statement of Elizabeth Cushwa, BOLI representative).[12] In using this example, Cushwa was responding to concerns that the amendments might expand the liability of private entities by making them places of public accommodation through association with publicly-owned entities. Cushwa explained that a church could not be held liable for discrimination under the new amendments simply because it rented a gym from a public entity. Rather, the amendments imposed new obligations on the *public school*, which would be barred from discriminating in making rental decisions; if it rented the space to a Methodist church, it would be required to rent it to an Episcopal church as well. Senator Jackie Dingfelder used this same example while introducing the bill on the Senate floor. Senate Floor Debate on H.B. 2668, 2013 Leg., 77th Sess. (Or. 2013) (statement of Senator Jackie Dingfelder).[13] These statements suggest members of the Oregon Legislature understood that the amendment would make public schools places of public accommodation.

However, in her testimony to the Senate Committee on the Judiciary, Cushwa also acknowledged the analysis of whether a place is one of public accommodation may change depending on who was using the space and how it was used. For example, although inmates at a jail might not be entitled to the public accommodations law's protections, jails would be considered

---

[12] Audio recording at 18:15, http://oregon.granicus.com/MediaPlayer.php?clip_id=1429 (last accessed Aug. 4, 2016).

[13] Audio recording at 1:21:14, http://oregon.granicus.com/MediaPlayer.php?clip_id=6712 (last accessed Aug. 4, 2016).

places of public accommodation with respect to tours given to the general public.[14] This testimony leaves open the possibility that public schools are not places of public accommodation with respect to students and staff, who must meet certain criteria to be on campus during the school day.

Having found the text and legislative history ambiguous, I turn to other authorities. The Missouri Court of Appeals recently decided public schools were places of public accommodation for the purposes of the Missouri's human rights statute. *Doe ex rel. Subia v. Kansas City, Mo. Sch. Dist.*, 372 S.W.3d 43, 48-50 (Mo. Ct. App. 2012). In *Subia*, the defendant school district made the same argument advanced by PPS defendants here: that public schools are not open to the public within the meaning of the statute because

members of the general public do not have unfettered and unlimited access to it. . . . Missouri law contains limits on students' access to public schools based upon age, residency, and immunization requirements, and school districts restrict the general populace's access to school buildings to protect the safety and welfare of students.

*Id.* at 49. The court explained that it would have to determine "whether a place of public accommodation must be accessible by *all* members of the public to be 'open to the public.'" *Id.*

The court concluded the answer to this question was no. The court looked to other examples of places of public accommodation such as bars, restaurants, and concert or sporting venues, noting that "restaurants restrict minors from access to areas in which alcoholic beverages are served and exclude persons who do not comply with dress codes. Resorts, movie theaters, concert halls, and amusement parks impose age and height restrictions on patrons. Nevertheless, . . . these facilities [are] 'places of public accommodation.'" *Id.* at 50. Relying on these restrictions, the court held that

---

[14] Audio recording at 19:10. 19:18,
http://oregon.granicus.com/MediaPlayer.php?clip_id=1429 (last accessed Aug. 4, 2016).

Page 29 - OPINION AND ORDER

"limiting the phrase 'open to the public' . . . to mean accessible by *all* members of the populace would be contrary to the legislature's intent and would effectively nullify the prohibition against discrimination in public accommodations." *Id.* at 49-50. The *Subia* court was interpreting a Missouri law according to Missouri principles of statutory interpretation, and its holding and reasoning are not binding in this Court. Nonetheless, I find the analysis persuasive and consistent with the Oregon courts' framework for interpreting statutes.

Finally, I note that Oregon's law prohibiting discrimination in places of public accommodation is a remedial statute. Therefore, to the extent it is ambiguous, it should be interpreted liberally "to promote the beneficial results intended" — *i.e.*, the prevention of discrimination. *Newell v. Taylor*, 321 P.2d 294, 297 (Or. 1958). With this canon of statutory construction in mind, I conclude public schools are places of public accommodation pursuant to Or. Rev. Stat. § 659A.400(1), as amended in 2013; accordingly, plaintiff's claims against PPS defendants pursuant to Or. Rev. Stat. § 659A.403 are legally viable.

3.    *Merits of Discrimination Claims*

I now turn to the merits of plaintiff's discrimination claims. The legally viable discrimination claims are (1) equal protection claims under the Fourteenth Amendment against Cooper and Callin in their individual capacities; and (2) state-law discrimination claims against PPS defendants pursuant to Or. Rev. Stat. § 659A.403, which prohibits discrimination on account of race, religion, or national origin in places of public accommodation.[15]

---

[15] Plaintiff initially pleaded aiding and abetting claims against Cooper and Callin, but now voluntarily withdraws those claims. PPS Mot. Summ. J. at 45 n.12 (doc. 47).

i. *Legal Standards*

"The Equal Protection Clause of the Fourteenth Amendment commands that . . . all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). In other to prevail on her Fourteenth Amendment claim, plaintiff "must first prove that the defendants purposefully discriminated against her" because of her race, national origin, or religion. *Lowe v. Monrovia*, 775 F.2d 998, 1010 (9th Cir. 1985). PPS contends that, in order to survive summary judgment, plaintiff must make out a prima facie case of discrimination under the test for discrimination under Title VII of the Civil Rights Act, which requires a plaintiff to show (1) she belongs to a protected class; (2) she was performing her work satisfactorily; (3) she suffered an adverse action; and (4) others not of her protected class were treated more favorably. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). This is not quite correct. "[T]here is a very close relationship" between Title VII and equal protection violations, *Bator v. State of Haw.*, 39 F.3d 1021, 1028 n.7 (9th Cir. 1994), and decisions addressing these types of claims tend to be "remarkably similar," *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 754 (9th Cir. 2001). Nonetheless, "courts in the Ninth Circuit are not bound by the formal Title VII disparate treatment . . . framework when trying section 1983 claims." *Id.* Instead, "in order to survive a motion for summary judgment by the defendant, a plaintiff must only produce evidence sufficient to establish a genuine issue of fact as to the defendant's motivations." *Fed. Deposit Ins. Corp. v. Henderson*, 940 F.2d 465, 471 (9th Cir. 1991).

The requirements to state a prima facie claim under the state statute are similar, entitling persons in Oregon equal treatment in places of public accommodation, "without any distinction, discrimination or restriction on account of race, color, religion, sex, sexual orientation, national

Page 31 - OPINION AND ORDER

origin, martial status or age[.]" Or. Rev. Stat. § 659A.403. In adjudicating a claim under section 659A.403, "the issue is whether [the plaintiff] was treated in an 'unequal' manner because of [a protected characteristic] and whether that treatment resulted in an injury[.]" *Allen v. U.S. Bancorp*, 264 F. Supp. 2d 945, 954 (D. Or. 2003). Accordingly, the same evidence sufficient to support a genuine issue of material fact as to plaintiff's equal protection claim — evidence that PPS defendants terminated plaintiff's internship for an impermissible discriminatory reason — is also sufficient to state a prima facie case for violation of the state statute.

However, plaintiff's state-law discrimination claims, unlike her equal protection claims, are subject to the *McDonnell Douglas* burden-shifting framework. This is because claims of discrimination under Oregon law are analogous to Title VII claims rather than Fourteenth Amendment claims, and so must be analyzed under the federal procedural law applicable to such claims.[16] *See Yoakum v. Wells Fargo Nank, Nat'l Ass'n*, 2011 WL 1541285, *7 (D. Or. Mar. 30, 2011); *Gaines v. Nordstrom, Inc.*, 2006 WL 2711779, *5 (D. Or. Sept. 19, 2006). After a plaintiff shows prima facie evidence of discrimination, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory" reason for the termination of the internship. *McDonnell Douglas*, 411 U.S. at 802. The burden then shifts back to the plaintiff to show the purportedly nondiscriminatory justification was pretextual. *Id.* at 805.

___

[16] Oregon courts have rejected the burden-shifting framework for their analysis of discrimination claims under Oregon state law. *Callan v. Confederation of Or. Sch. Administrators*, 717 P.2d 1252, 1254 (Or. Ct. App. 1986). Nonetheless, because the *McDonnell Douglas* framework is procedural and not substantive, it must be applied to state claims in federal court. *See Dawson v. Entek Int'l*, 630 F.3d 928, 935 (9th Cir. 2011) (affirming that the *McDonnell Douglas* framework governs analysis of claims of discrimination under Oregon state law regardless whether the federal court has diversity or pendent jurisdiction over the state-law claims).

The analysis of plaintiff's discrimination claims thus proceeds in two stages. First, I must determine whether plaintiff has stated a prima facie case of discrimination. If she has, her equal protection claims survive summary judgment, and her state-law discrimination claims proceed to the next phase of the *McDonnell Douglas* framework. Second, I must assess (1) whether PPS defendants have provided a legitimate, nondiscriminatory reason for terminating plaintiff's internship; and (2) whether plaintiff has introduced sufficient evidence of pretext to survive summary judgment on the state-law claim.

### ii. *Prima Facie Case*

The first issue is whether the record contains evidence sufficient to support an inference that PPS defendants terminated her internship on the basis of her race, national origin, or religion. I conclude it does.

Taking this evidence in the light most favorable to the plaintiff, as I must at this stage, I conclude reasonable jurors could infer that the decision to terminate plaintiff's internship immediately, rather than making additional attempts to address the areas of disagreement or explain to plaintiff how she needed to change her behavior, was traceable at least in part to PPS defendants' beliefs about the ability of a person of Russian origin and/or orthodox Christian faith to change her mind, adjust her behavior, or respect professional boundaries. The primary pieces of evidence supporting such an inference are: (1) the fact that PPS defendants made a unilateral decision to terminate the internship without ever warning plaintiff that possibility was on the table; (2) the fact that plaintiff never had a problematic interaction with a student, and raised her concerns in private conversations with PPS staff; (3) Cooper's statement about Russians and/or the Russian government being "judgmental"; and (4) plaintiff's testimony that PPS defendants were aware of her race,

Page 33 - OPINION AND ORDER

national origin, and religion, including her testimony that she asked whether there was room for her personal identity as a Russian and a Christian in her role as a counselor.

PPS defendants contend they are entitled to summary judgment because they made the decision to terminate plaintiff's internship due to legitimate concerns about student safety. To be sure, school policies on issues like educational equity and the appropriate approach to counseling LGBTQ students implicate tremendously important interests, including students' physical and mental health. A school with good reason to be concerned a counseling intern will put students' physical and mental health at risk is under no obligation to wait until the harm occurs before terminating the internship. That said, a public school cannot make a decision to terminate a graduate student's internship based on an imagined worst-case scenario resting on cultural and religious stereotypes.

A jury might conclude PPS defendants reasonably interpreted plaintiff's questions as revealing attitudes and biases that placed Madison students at immediate risk. But a jury also might conclude PPS defendants concluded plaintiff would be unable to gain cultural competency and/or separate her personal beliefs and history from her professional behavior because she is Russian and a Christian. Because there is ample evidence in the record from which the jury could draw either conclusion, plaintiff's claims PPS defendants unlawfully discriminated against her on the basis of race, national origin, and/or religion survive summary judgment.[17]

PPS defendants next assert plaintiff's discrimination claims are barred because she cannot overcome the "same-actor inference." *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1096-97 (9th

---

[17] Cooper and Callin are not entitled to qualified immunity with respect to the equal protection claims because it is beyond debate that a public school employee cannot constitutionally terminate a student's internship on the basis of the intern's race, national origin, or religion.

Cir. 2005). The same-actor influence provides that "where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory action." *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270-71 (9th Cir. 1996). "The same-actor inference is neither a mandatory presumption (on the one hand) nor a mere possible conclusion for the jury to draw (on the other.) Rather, it is a 'strong inference' that a court must take into account on a summary judgment motion." *Coghlan*, 413 F.3d at 1098 (quotation marks omitted). Plaintiff does not address this argument in her response to PPS's motion for summary judgment.

Cooper hired plaintiff in June 2013 and recommended terminating the internship in September 2013. Both plaintiff and Cooper testified that Cooper knew plaintiff was Russian when she was hired. Accordingly, the same-actor inference applies. Nonetheless, I find the presumption is overcome here. Based on Cooper's comments about Russians and the Russian government being "judgmental," a jury could conclude that Cooper considered the "upside" of plaintiff's Russian heritage when she made the hiring decision (international diversity) but only grew to fear a "downside" based on that same heritage and/or plaintiff's Christian religion once the internship had begun. Plaintiff's equal protection claims survive summary judgment.

### iii.    *Legitimate, Nondiscriminatory Reason and Pretext*

As explained above, PPS defendants have met their burden to articulate a legitimate, nondiscriminatory reason for terminating the internship. There remains a question of material fact, however, regarding whether that reason was pretextual; as explained, a jury could conclude from the evidence in the record that PPS defendants terminated the internship based on a belief that Russians and/or Christians are judgmental and unable to separate personal beliefs from professional conduct.

Page 35 - OPINION AND ORDER

Plaintiff's state-law discrimination claim under section 659A.403 survives summary judgment.

      D.     *Due Process Claim*

PPS defendants are entitled to summary judgment on this claim. Identification of a protected liberty or property right is a prerequisite of any Fourteenth Amendment due process claim. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 571 (1972). Plaintiff has identified neither. She had no protected property interest in her internship; she had no contract with PPS and PPS retained the right to terminate the internship at will. Plaintiff similarly has failed to articulate a liberty interest in any damage to her reputation. To assert a "stigma plus" due process claim based on governmental defamation, a plaintiff must show "the public disclosure of a stigmatizing statement." *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 982 (9th Cir. 2002). Plaintiff has not alleged PPS made any such statement. PPS defendants are entitled to summary judgment on plaintiff's due process claim.

      E.     *Contract Claims*

Finally, plaintiff asserts claims for breach and contract and breach of the duty of good faith and fair dealing against Lewis & Clark. She contends Lewis & Clark's unquestioning acceptance of PPS's decision to terminate her internship, failure to find her an alternative internship to be completed the same year, and requirement that she complete counseling and certain coursework before beginning a new internship (which delayed her graduation nine months) breached both an express promise not to discriminate on the basis of race, national origin, or religion, and an implied promise to give every student a fair shot at graduation. She further asserts Lewis & Clark's failed to comply with the implied duty of good faith and fair dealing in performing under the contract.

1.    *Existence of a Contract*

The basic framework of a contractual relationship is a promise in exchange for consideration. *Corbitt v. Salem Gas Light Co.*, 6 Or. 405, 406 (Or. 1877). It is generally accepted in Oregon and in other jurisdictions that the student-college relationship, which involves the payment of tuition for educational services, is essentially contractual in nature. *See Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir. 1998); *Tate v. North Pac. Coll.*, 140 P. 743, 745 (Or. 1914); *see also* Hazel Glenn Beh, *Student Versus University: The University's Implied Obligations of Good Faith and Fair Dealing*, 59 Md. L. Rev. 183, 189 (2000). Oregon law also "recognizes that a student and a private university *may* have a contractual relationship based on the terms contained in publications that the university provides to the student." *Dauven v. George Fox Univ.*, 2010 WL 6089077, *16 (D. Or. Dec. 3, 2010) (citing *Tate*, 140 P. at 745) (emphasis added). However, the enforceability of provisions in handbooks and catalogs depends on the specific facts of each case. *See Gibson v. Walden Univ., LLC*, 66 F. Supp. 3d 1322, 1324-25 (D. Or. 2014) (collecting cases). The relevant inquiry is whether a party's "communications and overt acts" suggest it "manifested assent" to be bound by a promise. *Kabil Developments Corp. v. Mignot*, 566 P.2d 505, 508-09 (Or. 1977). "Whether a statement or act is a manifestation of assent is a question of fact." *Martin v. Comcast of Cal./Col./Fl/Or., Inc.*, 146 P.3d 380, 388 (Or. Ct. App. 2006) (ellipses and quotation marks omitted).

Here, plaintiff has introduced ample evidence of a contractual relationship with Lewis & Clark: she paid tuition in exchange for educational services. Plaintiff asserts the terms of that contractual relationship are defined, in part, by documents developed by Lewis & Clark, including the Graduate School of Education and Counseling Program's Student Handbook and the 2012-13 Course Catalog. *See* Hadraba Decl. Ex. 1 & 3 (doc. 44). Specifically, plaintiff points to a

"Nondiscrimination Statement" in the Course Catalog, which reads:

Lewis & Clark adheres to a nondiscriminatory policy with respect to employment,
enrollment, and program. Lewis & Clark does not discriminate on the basis of actual
or perceived race, color, sex, religion, age, marital status, national origin, the
presence of any physical or sensory disability, or gender expression and has a firm
commitment to promote the letter and spirit of all equal opportunity and civil rights
laws[.]

Hadraba Decl. Ex. 3 at 2.

Lewis & Clark argues that a general, boilerplate provision such as this one is not enforceable

by the student in a contract action. In support this argument, Lewis & Clark points to the

"Disclaimer" printed above the "Nondiscrimination Statement":

Lewis & Clark College reserves the right to withdraw courses at any time, change the
fees, change the rules and calendar regulating admissions and graduation
requirements, and change any other regulations affecting the student body. Changes
shall become effective when approved and shall apply not only to prospective
students but also to those who are matriculated in Lewis & Clark college at the time.

Hadraba Decl. Ex. 3 at 2.

None of the District of Oregon or Oregon state court decisions cited by the parties address

whether such a nondiscrimination provision is enforceable in a contract action. However, the

District of Maine addressed similar questions in *Goodman v. President & Trustees of Bowdoin*

*College*, 135 F. Supp. 2d 40, 56 (D. Me. 2001). In *Goodman*, the plaintiff, who was white, was

expelled as a result of a physical altercation with another student, who was Korean. *Id.* at 44-46.

The plaintiff brought a number of claims against the university, including a claim for breach of

contract. He cited two provisions of the Bowdoin Student Handbook in support of his contract

claim. The first addressed nondiscrimination:

Respect for the rights of all and for the differences among us is essential to the
Bowdoin community. Discrimination . . . of others because of race, religious

Page 38 - OPINION AND ORDER

affiliation, gender, age, sexual orientation, physical characteristics, or other characteristics has no place in an intellectual community. . . . Such practices violate both the ideals of the College and its Social Code and are subject to appropriate disciplinary sanctions. When such incidents violate the statutes of the State of Maine, criminal prosecution may be pursued.

*Id.* at 56. The court rejected the plaintiff's argument that in expelling him, the university had discriminated against him on the basis of race in violation of the handbook provision. The provision did not bind the university, as its purpose was "clearly" to provide the college with authority to take disciplinary action against *students* who engaged in discrimination. *Id.* "[N]owhere in this provision does Bowdoin assume any responsibility for refraining from discrimination itself or set forth any consequences of discriminatory actions in its part." *Id.*

The court reached a different conclusion with respect to the other handbook provision cited by the plaintiff, which addressed the college's responsibilities in adjudicating student disciplinary incidents:

Bowdoin College acknowledges its responsibility to conduct judicial procedures which reflect fundamental fairness. For the purposes of assuring fairness and consistency, the College adopts . . . protections for students under conduct review . . . impartial proceedings, the opportunity to provide evidence and witnesses . . . and the right to a College member, uninvolved with the case, available for personal support at the formal Judicial Board hearing.

*Id.* at 57. The court found this provision, unlike the nondiscrimination provision, "indicate[d] Bowdoin's manifestation of its intent to be bound by the standard of fundamental fairness, the requirement of impartiality, and the delineated procedures." *Id.*

The defendant college pointed to a reservation clause in the contract, which retained the right to "make changes to the areas of course offerings, degree requirements, regulations, procedures, and charges." *Id.* (internal quotation marks omitted). The court found this clause did not permit the

Page 39 - OPINION AND ORDER

college to withdraw or alter its fundamental fairness promise. The court also noted that "it appears
. . . that Bowdoin agreed to promote certain principles and abide by certain procedures, and that
Plaintiff agreed to the possibility that Bowdoin might change the procedures during his years at
Bowdoin, with the understanding that Bowdoin would consequently be bound by those new
procedures." *Id.* In other words: the college retained to make certain changes, but until it actually
made those changes, it was contractually bound to honor the current promises.

I find the District of Maine's analysis both persuasive and consonant with Oregon contract
law, and adopt it here. The Nondiscrimination Provision states that Lewis & Clark will adhere to
a nondiscrimination policy in its "program" decisions and specifically lists religion, race, and
national origin as protected classifications. It affirms Lewis & Clark's "firm commitment"
upholding antidiscrimination laws and principles. A juror reasonably could read these statements
as manifesting an intent to abide by those principles. Nor does the "Disclaimer" necessarily relieve
Lewis & Clark of this contractual duty. Like the reservation clause in *Goode*, the Disclaimer
specifically cabins Lewis & Clark's right to change courses, fees, admissions and graduation
requirements, and "other regulations affecting the study body." Hadraba Decl. Ex. 3 at 2. A juror
reasonably could conclude Lewis & Clark retained no right to rescind its nondiscrimination promise
and begin making discriminatory decisions based on a student's race, national origin, or religion.
Thus, plaintiff has stated a claim for breach of contract.

Plaintiff also has stated a claim for breach of the implied duty of good faith in fair dealing.
In Oregon, the law imposes that duty in every contract. *Best v. U.S. Nat. Bank of Or.*, 739 P.2d 554,
557 (Or. 1987). As explained, plaintiff and Lewis & Clark had a contractual relationship even if the
provisions of the Student Handbook and other materials are not contractually binding. If Lewis &

Page 40 - OPINION AND ORDER

Clark made decisions designed to deny plaintiff a fair chance at obtaining her degree, it breached its duty of good faith and fair dealing.

### 2. *Merits of Contract Claims*

The next question is whether there remain issues of material fact regarding Lewis & Clark's motivation in accepting PPS's termination of the internship and delaying plaintiff's graduation nine months by requiring plaintiff to complete certain coursework and counseling before beginning a new internship. Plaintiff contends Lewis & Clark's decisions were driven by bias tied to her religion, race, and national origin. Lewis & Clark says it made all its decisions by considering only appropriate educational and professional factors, *i.e.*, whether plaintiff was demonstrating competency in counseling skills. Accordingly, plaintiff's breach of contract and breach of the duty of good faith and fair dealing claims rise and fall together. The question is whether she has presented more than a scintilla of evidence that Lewis & Clark made its decisions for discriminatory reasons.[18]

Plaintiff's evidence of Lewis & Clark's discriminatory motives can be grouped into two categories. First, she has introduced evidence that some individuals felt Lewis & Clark was not a safe space to express Christian or conservative views. Plaintiff testified that a Lewis & Clark professor who was also a Christian and an immigrant told her she was a "perfect candidate for the counseling program," but warned her to keep her Christian faith private. Vejo Decl. ¶ 13 Apr. 29,

---

[18] Plaintiff makes one argument that does not fall under this umbrella: she asserts Lewis & Clark's immediate acceptance of PPS's decision to terminate the internship, coupled with its subsequent decision to hire Cooper, showed Lewis & Clark was more interested in maintaining its relationship with Cooper than with making the right decision for plaintiff. Plaintiff has introduced insufficient evidence to permit her to proceed on this theory.

2016; Vejo Dep. 239:3-20. She also testified that after a presentation on LGBTQ issues in Hadraba's class, Hadraba told the students "Christians are wrong" about their approach to sexual orientation, gender expression, and gender identity. Vejo Dep. 280:24-281:7. Plaintiff alleged Hadraba then encouraged "every student [to] say something against Christian." Vejo Dep. 279:4-280:17. Plaintiff "kept silent because I was ashamed, you know, to say I am a Christian." Vejo Dep. 280:9-17. Plaintiff also introduced evidence that in an anonymous evaluation, one Lewis & Clark student complained it was not possible to "express differing opinions" in Lewis & Clark counseling courses. Grey Decl. Ex. 21 at 3 Apr. 21, 2016. This student described "feel[ing] shouted down" and commented that "discussion and feedback isn't a safe space." *Id.*

Plaintiff alleges this negative attitude toward Christianity contrasts with the school's approach to other groups. For example, she introduced evidence Hadraba invited a speaker to present to her class on issues affecting LGBTQ students. Vejo Dep. 279:9-16. The speaker told the students if a family was opposed to a certain course of action for religious reasons, to contact her organization and they would "find for them another church which would support" the recommended action. Vejo Dep. 330:6-18. Plaintiff considered this tantamount to converting students away from the church and fomenting distrust of parents. Vejo Dep. 330:19-331:6. Plaintiff alleges Hadraba "praised" everything the speaker said; plaintiff interpreted this as promoting "only one values, but she ignores that other people have another value, like religion people, not necessary Christian, like Muslim or other." Vejo Dep. 279:9-16. Plaintiff testified Hadraba then approvingly told the class a story about a lesbian friend who took a job with a Christian college "because she wants to change the culture . . . [and] influence them to accept, you know, their values rather than Christian values." Vejo Dep 279:17-22.

Page 42 - OPINION AND ORDER

Second, plaintiff asserts the notes of Lewis & Clark professors documenting concerns about

her academic progress and competency in core counseling skills reveal bias based on her race and

national origin running throughout the faculty at the school. This category of evidence includes:

- Hadraba's testimony she was "concerned" about plaintiff's understanding of racism and racial equity after plaintiff shared a joke in class that in Russia, if you call someone black, everyone laughs, Hadraba Dep.133:4-18;

- McNamara's concern, after a discussion about the role of "gray areas" in counseling, plaintiff "just seemed out of touch and not understanding the culture in which she will work," referring to United States educational culture; McNamara Dep. 56:22-57:4;

- McNamara wondering in an email how to address plaintiff's "lack of understanding about the enormity of the job" after plaintiff expressed a desire to "fix" the hypothetical client described on the final, including a statement that "I'm thinking she is not in the right field if this has been her story in other classes. She just seemed out of touch and not understanding the culture in which she will work. I sincerely believe that meeting with me will not change how she will perform the second time around . . . it seems too ingrained in her thinking." Grey Decl. Ex. 20 Apr. 29, 2016; and

- Notes indicating plaintiff was "resistant to [the] subject matter" in her social justice class, Grey Decl. Ex. 24 at 2 Apr. 29, 2016.

This evidence is sufficient to withstand a motion for summary judgment with respect to

plaintiff's claims of discrimination on the basis of race/national origin and breach of the duty of good

faith and fair dealing, but not with respect to plaintiff's claim of discrimination on the basis of

religion.

Turning first to the religious discrimination claim, plaintiff has introduced evidence to

support an inference Hadraba expressed hostility toward the Christian church in her classes and

evidence some Christians did not feel comfortable expressing their beliefs in the Lewis & Clark

counseling program. However, she has not linked that evidence to Lewis & Clark's decisions

regarding her coursework and internship. None of the professors' stated concerns about plaintiff's

performance address or allude to religion or religious beliefs. Lewis & Clark had a valid and vested interest in ensuring plaintiff achieved competency in topics such as educational equity and approach to LGBTQ issues. The fact that plaintiff belongs to a religion with tenets addressing sexual orientation, gender identity, and gender expression does not convert Lewis & Clark's concern about cultural competency on these topics into religious discrimination.

Plaintiff's contract claims may proceed, however, on a theory of race/national origin discrimination. A reasonable juror could conclude from the evidence in the record that Lewis & Clark set plaintiff up for failure by neglecting to require completion of Ethical and Legal Issues and Social Justice and Diversity before beginning the macro internship and by failing to give plaintiff the supportive environment necessary to develop cultural competency. Lewis & Clark admitted plaintiff to the counseling program fully aware that she had grown up in Russia. The issues the professors identified regarding plaintiff's difficulty understanding United States educational and counseling culture are clearly connected to her national origin; the professors understood she might be having these difficulties because she had not grown up and attended school in the United States. It is reasonable for a school that trains counselors to require those counselors to attain an understanding of the specific cultural context in which they will work before granting them a counseling degree. But when a school decides to accept tuition dollars from a student who comes from a different culture, it takes on an attendant responsibility to work with that student in good faith toward mastery of the necessary skill set.

The record here reveals that Lewis & Clark had concerns about plaintiff's cultural competency, as well as about other skills (such as writing), directly related to her national origin. Nonetheless, Lewis & Clark awarded plaintiff high grades, accepted her tuition dollars, and placed

Page 44 - OPINION AND ORDER

her in a macro internship. Lewis & Clark did not make Social Justice and Diversity or Ethical and Legal Issues prerequisites to beginning the macro internship, nor did it suggest to plaintiff that because she grew up in a different culture, she might particularly benefit from completing those courses during her first year. A reasonable juror could conclude Lewis & Clark set plaintiff up for failure, and that its actions show a lack of good faith and fair dealing as well as discrimination on the basis of race/national origin.

Lewis & Clark argues that the evidence in the record supports the inference that Lewis & Clark worked with plaintiff in good faith and in a nondiscriminatory manner. In support of this argument, Lewis & Clark alleges that: (1) it gave plaintiff the opportunity to audit one of the courses she had not completed for free; (2) it refunded her tuition for the Madison macro internship to defray the costs associated with the delay; (3) professors spent significant time working with plaintiff to improve her writing and address other deficiencies; and (4) McNamara considered giving her a failing grade in Legal/Ethics, but instead opted to give her an incomplete so she still had a chance to graduate and become certified as a counselor. A reasonable juror could infer from these facts that Lewis & Clark was basing its decisions on legitimate educational/certification concerns and was making a genuine attempt to provide a way for plaintiff to gain the necessary competencies to graduate. However, as explained, that is not the only way to read the record. Because a reasonable juror could conclude Lewis & Clark acted in a discriminatory fashion and denied plaintiff a fair chance at graduating, plaintiff's contract claims survive summary judgment.

## CONCLUSION

PPS defendants' motion to strike (PPS Reply Mot. Summ. J. at 17-23 (doc. 66)) is GRANTED as to Exhibit 12 to the Grey Declaration and DENIED as to plaintiff's declaration.

Defendants' motions to strike (doc. 65 and PPS Reply Mot. Summ. J. at 17-23 (doc. 66)) are GRANTED IN PART and DENIED IN PART as to the Bufford Declaration, as set forth in detail in this Opinion.

Lewis & Clark's motion for summary judgment (doc. 41) and the PPS defendants' motion for summary judgment (doc. 47) are DENIED with respect to the Fourteenth Amendment claims against Cooper and Callin in their individual capacities (part of the first claim for relief); DENIED with respect to the state-law discrimination claims against PPS defendants pursuant to Or. Rev. Stat. § 659A.403 (fourth claim for relief); DENIED with respect to the contract claims against Lewis & Clark (sixth claim for relief); and GRANTED with respect to all other claims.

IT IS SO ORDERED.

Dated this ⑥ day of September, 2016.

Ann Aiken
United States District Judge